UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

FILED
03 JUL 21 PM 4:37

| | |
|---|---|
| DONELLA HARRIS ALLEN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Civil Action No. CV-02-S-0742-S |
| ) | |
| PROVIDENT LIFE AND ACCIDENT ) | |
| INSURANCE CO., *et al.*, ) | **ENTERED** |
| ) | **JUL 2 2 2003** |
| Defendants. ) | |

# MEMORANDUM OPINION

Plaintiff, Donella Harris Allen, a former employee of DMR Consulting Group, Inc. ("DMR"), filed this action under sections 1132(a)(1)(B) and (a)(3) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.* Plaintiff claims that she was wrongfully denied long-term disability benefits pursuant to her employer's group, long-term, disability insurance policy.[1] The policy was underwritten by defendant Provident Life and Accident Insurance Co. ("Provident"). Plaintiff commenced this action against Provident, the Long-Term Disability Plan of the DMR Consulting Group, Inc. ("the DMR Plan" or "DMR"), and DMR's parent company, Amdahl Corporation ("Amdahl"). This action now is before the court on motions for summary judgment filed by each defendant (doc. nos. 21-23), as well as Provident's motion for leave to file a reply brief (doc. no. 34).

Federal Rule of Civil Procedure 56(c) provides, in part, that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and

---

[1] The Complaint additionally asserted various state-law claims and demanded a trial by jury. *See* doc. no. 1. Those state-law claims were dismissed, and plaintiff's jury demand was stricken, pursuant to an order entered on August 2, 2002 (doc. no. 13). Thus, only plaintiff's ERISA denial-of-benefits claim remains pending.

that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986).

> In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment.
>
> The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)); *see also United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc).

Upon consideration of the pleadings, evidentiary submissions, and briefs, the court concludes that defendants' motions for summary judgment should be granted. Provident's motion for leave to file a reply brief will be denied as moot.

## I. SUMMARY OF FACTS

**A.     The DMR Plan**

Plaintiff was first hired by DMR on February 9, 1998, to work full-time as an administrative

assistant.[2] As a full-time employee, she was afforded long-term disability insurance coverage under an employee welfare benefit plan (the "DMR Plan") issued by Provident and governed by ERISA.[3] As set forth in the policy, The DMR Plan affords Provident discretionary authority to make decisions on claims such as plaintiff's:

> Except for those functions that this Policy specifically reserves for the Policyholder, the Policyholder delegates and agrees that [Provident Life and Accident Insurance Company] shall have *full, exclusive, and discretionary authority* to control, manage, and administer claims, and to interpret and resolve all questions arising out of the administration, interpretation, and application of this Policy.[4]

The policy definition for the terms "total disability or totally disabled" reads as follows:

> TOTAL DISABILITY OR TOTALLY DISABLED means that Covered Persons:
>
> 1. are unable to perform all the material duties of their own occupation on a full-time or part-time basis because of an Injury or Sickness that started while insured under this Policy;
>
> 2. do not work at all in any occupation; and
>
> 3. are under [a] Physician's [c]are.[5]

### B. Plaintiff's Initial Claim

Plaintiff submitted her initial claim for long-term disability-benefits on February 1, 2000, stating that she had become totally disabled as the result of a "head [and] brain injury" suffered during an automobile accident on December 30, 1998.[6]

---

[2] Defendant's evidentiary submissions, Tab 4, at document bearing Bates stamp number PLACL00100. ***Nota bene*:** Both parties refer to the large quantity of documents relating to plaintiff's disability claim bound under Tab 4 of defendant's evidentiary submission by reference to the five-digit Bates stamp number impressed on each page, and so will this court. **Accordingly, all subsequent references to "PLACL00###" are to the page number(s) of documents collected under Tab 4 of defendant's evidentiary submission (doc. no. 25).**

[3] *See id.*, Tab 2 (LTD Insurance Policy for DMR employees).

[4] *Id.* at 26 (emphasis supplied).

[5] *Id.* at 10.

[6] PLACL00102.

Plaintiff recorded on the claim form that her job as an administrative assistant was sedentary in nature, requiring her to sit for thirty hours and stand for ten hours each week.[7] Her main job duties included handling time sheets, maintaining employee data on spreadsheets, typing resumes, answering the telephone and taking messages, handling faxes, maintaining a new hire packet, making photocopies, handling mail, and ordering office supplies.[8]

Plaintiff also submitted several forms ("attending physician statements") that had been completed on her behalf by three health care professionals: physician Dr. Kyle Hudgens; psychiatrist Dr. Jorge Castro; and, psychologist Dr. Parker Storey. In response to the question "[w]hen should the patient be able to return to work," Dr. Hudgens (physician) wrote the word "NO" as to both part-time and full-time employment.[9] In contrast, Dr. Castro (psychiatrist) opined that plaintiff would be able to return to work on a full-time basis on February 10, 2000.[10] Dr. Storey (psychologist) did not answer the question.[11] Drs. Castro and Storey diagnosed plaintiff as suffering from "major depression."[12] Dr. Hudgens diagnosed plaintiff as suffering from a head injury caused by a motor vehicle accident.[13] Plaintiff also provided a list of several other health care professionals whom she had consulted regarding her injury.[14]

**B.     Denial of Claim**

After receiving plaintiff's claim, Provident gathered and examined her medical records. The

---

[7] *Id.*
[8] *Id.*; PLACL00098-99.
[9] PLACL00095.
[10] PLACL00096.
[11] PLACL00097.
[12] PLACL00096-97.
[13] PLACL00095.
[14] PLACL00091-92.

contents of those records are summarized below.

Plaintiff consulted neurosurgeon Dr. Swaid Swaid about a month after her automobile accident. Dr. Swaid's examination did not reveal any intracranial abnormalities, even though plaintiff reported chronic headaches and chronic sinusitis. He recorded that a "CT of the head was done on 12/30/98 and reveals swelling over left frontal *scalp* with metal or glass in swollen area. *There are no intracranial abnormalities*."[15] Dr. Swaid's prescribed treatment was to "[r]epeat CT scan of the head with additional bone windows."[16]

On March 24, 1999, physician Dr. Robert Slaughter wrote a "clinic note," which summarized his findings after examining plaintiff. The note recorded that, while plaintiff still complained of regular headaches and memory problems, "she feels that she has definitely improved in terms of her headache severity . . . . Her physical examination remains normal from a neurological standpoint."[17] Dr. Slaughter's impression was that plaintiff was suffering from "[p]osttraumatic headaches."[18]

Plaintiff underwent an interview and neurological testing on May 25, 1999, and a report detailing the results was prepared by neuropsychologist Dr. Thomas Novack and post-doctoral fellow Dr. Tannahill Glen.[19] The "summary" section reads as follows:

> *The head injury Ms. Harris sustained approximately five months ago appears to have been mild in degree at most. She performed quite well on neuropsychological testing overall.* The only exceptions were difficulty in the areas of psychomotor speed, spontaneous word retrieval, reading comprehension, and memory for visual material. Otherwise, performance was within normal limits. Although the symptoms she reports, including memory, attentional problems, and irritability/mood changes, are frequently seen following *mild* TBI [apparently an acronym for "Traumatic Brain Injury"], such symptoms usually resolve within six months. *At the very least, they*

---

[15] PLACL00143 (emphasis supplied).
[16] PLACL00142.
[17] PLACL00022.
[18] *Id.*
[19] PLACL00009-13.

> *would not be expected to spontaneously worsen, as Ms. Harris' symptoms have, by her own report. There appear to be contributing factors that have exacerbated the cognitive and emotional symptoms Ms. Harris experiences. Depression appears to be a significant problem and this could at least partially account for the mild deficits noted in today's evaluation.* Furthermore, Ms. Harris also experiences considerable anxiety and is more vigilant than others might be to relatively mild deficits. *Despite current reported difficulties, Ms. Harris appears to be functioning relatively well at work and might be expected to return to previous capabilities if the depression is addressed successfully.*[20]

Plaintiff was seen by Dr. Storey on roughly a dozen occasions between December of 1999 and June of 2000. While Dr. Storey's handwritten notes are sometimes illegible, the following relevant excerpts can be culled from the record:

> 12/2/99: Pt. seen. She looks better today than she has in weeks. Pain [down] - she had block done by new neurologist — she likes this M.D. (Hudgens). Been using prog. muscle relax. tape — she has been sleeping better. Mood improved.
>
> 12/16/99: Pt. seen. Nephew shot/killed himself . . . 1 [week] ago. She's handling this well considering. Reports little stress . . . a general improvement in mood [and] outlook.
>
> [Dr. Storey's notes dated 2/7/00 and 2/9/00 are almost entirely illegible]
>
> 2/18/00: Pt. seen. Very passive — exaggerates her presentation . . . these characteristics appear to be exaggerated by her passivity. . . .
>
> 3/2/00: Pt. seen. Lengthy discussion re: her passivity when it comes to protecting herself.
>
> 3/15/00: Pt. seen. . . .
>
> 3/29/00: Pt. seen. She got angry during deposition — this is a [positive] sign. Still working part time [and] enjoying it. Gradually developing some insight into her passivity.
>
> [Dr. Storey's notes dated 4/12/00 are almost entirely illegible]
>
> 4/13/00: Pt. seen. Discussed findings of last neuro . . . exam. Pt[.] became

---

[20] PLACL00013 (emphasis supplied).

|         |                                                                                                                                                                                                                                                          |
| ------- | -------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------- |
|         | tearful . . . . She's very afraid she won't be able to function in the workplace.                                                                                                                                                                        |
| 4/20/00: | Pt. seen. Great progress! She went dancing twice — met new people. She's begun to think what she would like to do career-wise. She has a lot of creative interests, but extremely passive personality [and] low self-esteem are obstacles. |
| 5/16/00: | Pt. seen. Continuing to do cognitive therapy — long [history] of low self-esteem. She personalizes most interactions.                                                                                                                                    |
| 6/1/00:  | Pt. seen. She got DDS[21] — she also met a [male] that she is dating. Feels more financially secure. Mood slightly improved.                                                                                                                             |
| 6/15/00: | Pt. seen. [The remainder of Dr. Storey's notes on this date are largely illegible.][22]                                                                                                                                                                  |

Plaintiff underwent another neuropsychological evaluation on March 1, 2000, one month after submitting her claim for disability benefits. The results were recorded in a report co-authored by University of Alabama at Birmingham Department of Neurology instructor Marla A. Shawaryn, Ph.D., and clinical neuropsychologist Daniel C. Marson, J.D., Ph.D.[23] The report stated that plaintiff was referred for the evaluation "by Dr. Kyle Hudgens for evaluation of her cognitive and emotional functioning and of her capacity to return to work."[24] The section summarizing plaintiff's test performance was prefaced by this statement: "The current results must be interpreted with some caution as they may underestimate the patient's actual current levels of cognitive and emotional functioning."[25] The following statements summarize plaintiff's performance on a battery of tests:

A comparison of Mrs. Harris' current neuropsychological test results with

---

[21] The letters "DDS" apparently refer to the Social Security Administration's Decisional Document Sheet, which recommended that plaintiff receive disability payments. *See* plaintiff's evidentiary submissions, Exhibit 2 (plaintiff's Social Security Administration disability claim documentation).

[22] PLACL00120-37.

[23] *See* PLACL 00086-90.

[24] PLACL00090.

[25] PLACL00088.

those obtained in May 1999 with Drs. Glen and Novack revealed *unexpected and significant cognitive declines.* Specifically, Mrs. Harris demonstrated declines in areas of overall intellectual functioning, verbal intellectual functioning, nonverbal intellectual functioning, high-load verbal learning and recall, immediate and delayed verbal memory, confrontation naming, and visuomotor tracking/set flexibility.

Mrs. Harris' overall intellectual functioning declined from the low average range [IQ of 88, 21st percentile] in May 1999 to the mildly impaired range [IQ of 77, 6th percentile] currently. The patient's verbal intellectual functioning dropped from the low average range [Verbal IQ of 87, 19th percentile] to the mildly impaired range [verbal IQ of 75, 5th percentile]. Her nonverbal intellectual performance fell from the average range [nonverbal IQ of 91, 27th percentile] to the low average range [nonverbal IQ of 84, 14th percentile]. Additional areas of decline occurred in mental arithmetic, auditory attention, abstract reasoning, mental flexibility, executive function, and visuomotor scanning. Mrs. Harris also demonstrated a decline in high-load verbal learning and recall, falling from an average performance to severely impaired. She also exhibited a decline in immediate and delayed verbal memory, dropping from the average range to the mildly impaired range. Mrs. Harris showed a decline on confrontation naming, falling from the low average range [13th percentile] to the severely impaired range [<1st percentile]. Lastly, Mrs. Harris appears to have declined in visuomotor tracking/set flexibility, dropping from the average range [32nd percentile] to the mildly impaired range [5th percentile].

While Mrs. Harris demonstrated depression and anxiety currently, she also exhibited such symptoms at the May 1999 evaluation.

*There does not appear to be an intervening neurological event or condition in the medical record to explain these marked declines in cognitive function.* Mrs. Harris' cognitive profile would be expect [sic] to remain stable or possibly improve since the May 1999 evaluation.

. . . .

It is likely that the patient's condition and test performance represents an intensifying post-concussive syndrome which reflects the increasing contributions of psychiatric and other factors.

. . . .

**In the examiners' opinion, with successful psychiatric treatment of her post-concussive syndrome, Mrs. Harris should be able to return to work as a secretary.**[26]

---

[26] PLACL00086-88 (italicized emphasis supplied; boldface emphasis in original).

Several experts employed by Provident reviewed plaintiff's medical records during December of 2000 and January of 2001. Licensed Professional Counselor Jane Price reviewed Dr. Storey's notes, as well as the two reports summarizing the results of plaintiff's neurological testing, and concluded: "I do not think that the information [contained in Storey's notes and plaintiff's test results] provides consistent, credible support for R&L's [apparently an acronym for "Restrictions and Limitations"] related to any psychiatric diagnosis."[27]

Registered Nurse Bradford Stuman reviewed plaintiff's medical records on January 4, 2001,[28] and concluded:

> The diagnosis of headache/facial pain is supported by self report only. There is not any available diagnostic testing to measure pain. The CT head was essentially negative and the Spine x-rays show degenerative changes. . . . *From a General Medical viewpoint there does not appear to be a diagnosis that would prevent claimant from working.*[29]

Dr. David Goldsmith, a physician employed by Provident, reviewed plaintiff's medical records on January 15, 2001, and concluded that "the records do not present ample, consistent, reliable and verifiable clinical evidence that a mental disorder, of sufficient type and severity, imposes occupational impairment that prevents [plaintiff] from working."[30]

Based upon the conclusions of its experts, Provident denied plaintiff's claim for long-term disability-benefits on or about February 1, 2001.[31] Provident contemporaneously mailed plaintiff a letter explaining that she did not meet the policy's definition of "total disability," and specified the medical records that undermined plaintiff's contention that she was totally disabled.[32]

---

[27] PLACL00453-54.
[28] PLACL00457-59.
[29] PLACL00457-58 (emphasis supplied).
[30] PLACL00468-69.
[31] PLACL00473-75.
[32] *Id.*

C.      **Appeal**

Plaintiff appealed Provident's decision on June 29, 2001. She submitted additional information, consisting of a Social Security Administration benefits award letter (finding that she was "totally disabled due to organic mental disorders (chronic brain syndrome),"[33] and, a copy of the deposition of Dr. Hudgens taken in connection with her action for personal injuries against the driver of the other motor vehicle involved in her December 1998 collision.[34]

Hudgen's deposition testimony revealed that he treated plaintiff's complaints of head pain by prescribing a series of three "nerve block" injections, which gave her three to four weeks of relief.[35] When asked whether plaintiff's headaches were a permanent condition, he opined that "there's certainly a likelihood that [they] could be, that [the headaches] would need continued treatment."[36] Dr. Hudgens answered "Yes" when asked whether plaintiff "would need further psychological help in order to get . . . back to work?"[37] Upon further questioning, Hudgens admitted that his diagnosis of plaintiff's headaches was based wholly on her subjective complaints.[38]

A Provident employee, psychiatrist and neurologist Dr. Alan Neuren, reviewed the documentation presented by plaintiff and concluded:

> The records do not support a diagnosis of cognitive disturbance due to direct effects of a traumatic injury. The cognitive deficits are secondary to emotional dysfunction affecting her performance on the tests. Although headaches may occur after a minor injury, they typically resolve spontaneously after several months. The records

---

[33] Plaintiff's evidentiary submissions, Exhibit 2 (plaintiff's Social Security Administration disability claim documentation).

[34] Provident's brief in support of summary judgment, at 9. Provident cites documents bearing Bates Stamp numbers PLACL00474-75, but those documents apparently were not included in its evidentiary submissions.

[35] *Id.*, Exhibit 1 (Hudgens deposition), at 26. It is not clear from Dr. Hudgens's testimony whether plaintiff was given all three injections on the same occasion.

[36] *Id.* at 27-28.

[37] *Id.* at 34-35.

[38] PLACL00512-13.

indicate that the claimant has been able to become more socially active as well as begin a home business. This would indicate that she is capable of functioning in her usual occupation.[39]

Provident informed plaintiff that it denied her appeal on or about September 25, 2001.[40] This action followed.[41]

## II. DISCUSSION

### A.   DMR and Amdahl

Plaintiff does not oppose the entry of summary judgment in favor of defendants DMR and Amdahl, but asks that her claims against those defendants be dismissed *without* prejudice.

> With regard to Defendants, Amdahl and DMR Consulting Group, Inc., the plaintiff accepts defense counsel's representation that those two defendants were not responsible for administering, considering or adjudicating the claim for benefits or denial. Therefore, the plaintiff would agree that Amdahl and DMR Consulting Group, Inc. should be dismissed from this case *without prejudice*.[42]

Upon consideration, however, this court finds that all claims asserted against Amdahl and DMR are due to be dismissed *with prejudice*. Plaintiff did not provide any argument opposing those defendants' well-supported motions for summary judgment; accordingly, her claims against those defendants are deemed to have been abandoned. *See, e.g.*, *Chapman v. AI Transport* 229 F.3d 1012, 1027 (11th Cir. 2000) (en banc) ("Parties opposing summary judgment are appropriately charged with the responsibility of marshaling and presenting their evidence before summary judgment is granted, not afterwards."); *Lazzara v. Howard A. Esser, Inc.*, 802 F.2d 260, 269 (7th Cir. 1986) (holding that a ground not pressed in opposition to a motion for summary judgment is to be treated

---

[39] PLACL00594.

[40] PLACL00602-05.

[41] *See* Complaint (doc. no. 1).

[42] Plaintiff's brief opposing summary judgment, at 10 (emphasis supplied).

by the district court as abandoned).[43]

**B.     Provident**

As a threshold matter, the court must determine the appropriate standard for reviewing Provident's denial of plaintiff's claim for long-term disability-benefits, because ERISA does not specify the standard applicable to the decisions of a plan administrator or fiduciary. *See Jordan v. Metropolitan Life Insurance Co.*, 205 F. Supp. 2d 1302, 1305 (M.D. Fla. 2002) (citing, *e.g.*, *Marecek v. BellSouth Telecommunications*, 49 F.3d 702, 705 (11th Cir. 1995)).

The Supreme Court held in *Firestone Tire & Rubber Co. v. Bruch* that "a denial of benefits . . . is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility benefits or to construe the terms of the plan." 489 U.S. 101, 115, 109 S. Ct. 948, 956-57, 103 L. Ed. 2d 80 (1989). Pivoting off the *Bruch* decision, the Eleventh Circuit has promulgated a scale of three ascending standards for reviewing the decisions of a claim administrator: "(1) *de novo* where the plan does not grant the administrator discretion; (2) arbitrary and capricious [where] the plan grants the administrator discretion; and (3) heightened arbitrary and capricious where there is a conflict of interests." *Buckley v. Metropolitan Life Insurance Co.*, 115 F.3d 936, 939 (11th Cir. 1997). Here, the plan grants the claims administrator the discretion to construe the terms of the plan. Moreover, because Provident serves both as claim administrator and pays claims from its own funds, it has a conflict of interests. The

---

[43] *Cf., e.g., Lucas v. W.W. Grainger, Inc.* 257 F.3d 1249, 1255 n.1 (11th Cir. 2001) ("Lucas has abandoned his unlawful harassment claim by not raising it in his initial brief on appeal.") (citing *Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1317 n.17 (11th Cir. 1999) ("Issues that are not clearly outlined in an appellant's initial brief are deemed abandoned.") (citations omitted)); *Hartsfield v. Lemacks*, 50 F.3d 950, 953 (11th Cir. 1995) ("We note that issues that clearly are not designated in the initial brief ordinarily are considered abandoned.") (quotation marks and citation omitted); *Marek v. Singletary*, 62 F.3d 1295, 1298 n.2 (11th Cir. 1995) ("Issues not clearly raised in the briefs are considered abandoned.") (citing *Allstate Insurance Co. v. Swann*, 27 F.3d 1539, 1542 (11th Cir. 1994)); *Greenbriar, Ltd. v. City of Alabaster*, 881 F.2d 1570, 1573 n.6 (11th Cir. 1989) (declining to addressed issue for failure of party to argue it in its brief on appeal).

heightened level of scrutiny therefore applies.

Under the heightened arbitrary and capricious standard, the court must first determine on *de novo* review whether Provident's decision to deny plaintiff long-term disability-benefits was "wrong." *See HCA Health Services of Georgia v. Employers Health Insurance Co.*, 240 F.3d 982, 993 n.23 (11th Cir. 2001) ("'Wrong' is the label used by our precedent to describe the conclusion a court reaches when, after reviewing the plan documents and disputed terms *de novo*, the court disagrees with the claim administrator's plan interpretation."). The court moves to the next step in its inquiry, to examine whether Provident's actions were arbitrary and capricious because of its conflict of interests, only if Provident's decision is first deemed to be "wrong." *See, e.g., Brown v. Blue Cross & Blue Shield of Alabama*, 898 F.2d 1556, 1566 n.12 (11th Cir. 1990) ("It is fundamental that the fiduciary's interpretation first must be 'wrong' from the perspective of *de novo* review before a reviewing court is concerned with the self-interest of the fiduciary.") (emphasis supplied). Stated differently, if the court finds that Provident's decision to deny plaintiff long-term disability-benefits was *not* "wrong," the inquiry is at an end, and summary judgment is due to be entered in favor of Provident.

The analysis of whether plaintiff meets Provident's eligibility criteria for long-term disability-benefits is difficult because the condition that plaintiff complains of — pain as a result of "head and brain injury" — is supported primarily by her subjective complaints, although her performance on various neuropsychological tests also must be taken into account. Plaintiff claims that three items of evidence prove that Provident's decision to deny her long-term disability-benefits was "wrong": (1) the opinion of one of her treating physicians, Dr. Kyle Hudgens; (2) the Social Security Administration's determination that she is totally disabled; and (3) her performance on the

March 1, 2000 neuropsychological evaluation. The court will discuss each in turn.

### 1. Dr. Hudgens's opinion

The "attending physician's statement" submitted by Dr. Hudgens indicates that plaintiff would not be able to return to work in either a full- or part-time capacity.[44] When questioned at deposition about the basis of that opinion, Dr. Hudgens stated that he relied on that portion of plaintiff's neuropsychological testing in which "the people who performed the testing suggested psychiatric treatment for the post-concussive syndrome that would enable [plaintiff] to return to work . . . as a secretary."[45] Dr. Hudgens added that he also relied upon plaintiff's subjective complaints of pain, because "[m]ost of the diagnosis of headache is subjective and so you have to believe people's complaints."[46] Dr. Hudgens summarized plaintiff's prognosis as follows:

> A:   . . . I think the headaches may need some intermittent ongoing treatment, especially since we have had a degree of success with the [nerve] blocks. She will need ongoing or, in my opinion, some ongoing psychiatric help in order to get her at an increased functional state.
>
> Q:   Doctor, do you have an opinion as to whether or not at this time [plaintiff] could be able to go back to her job as a secretary?
>
> A:   Actually, I haven't seen her since February the 14th.
>
> Q:   Let's talk about February the 14th then. At that time, did you?
>
> A:   At that time, she could not.
>
> Q:   Is it your opinion . . . [that] she would need further psychological help in order to get her back to work?
>
> . . . .

---

[44] PLACL00095.
[45] PLACL00543.
[46] PLACL00516.

A: Yes.[47]

Thus, Dr. Hudgens did not testify that plaintiff could not return to work, but only that "she would need further psychological help in order to" do so.[48] By comparison, plaintiff's attending psychiatrist, Dr. Jorge Castro, opined that she would be able to return to work on a full-time basis by February 10, 2000.[49]

### 2. The Social Security determination

Plaintiff claims that the Social Security Administration's determination that she is permanently disabled is evidence that Provident's decision is wrong. The documentation submitted by the parties does not provide a basis for discerning how the Social Security Administration arrived at its decision.[50] Even if it did, "the approval of disability benefits by the Social Security Administration is not considered dispositive on the issue of whether a claimant satisfies the requirement for disability under an ERISA-covered plan." *Whatley v. CNA Insurance Co.*, 189 F.3d 1310, 1314 n.8 (11th Cir. 1999) (citing *Paramore v. Delta Airlines, Inc.*, 129 F.3d 1446, 1452 n.5 (11th Cir. 1997).

### 3. Plaintiff's March 1, 2000 neuropsychological evaluation

As discussed in § II(B) *supra*, plaintiff underwent two neuropsychological evaluations, the first on May 25, 1999, and the second on March 1, 2000, about one month after she filed her claim for long-term disability-benefits. Her test performance during the March 1, 2000 neuropsychological evaluation was significantly different from her performance the previous year.

---

[47] Plaintiff's evidentiary submissions, Exhibit 1 (Hudgens deposition), at 33-35.
[48] *See id.*
[49] PLACL00096-97.
[50] Plaintiff's evidentiary submissions, Exhibit 2 (plaintiff's Social Security Administration disability claim documentation).

Plaintiff asserts that this remarkable deterioration in her condition militates toward a finding that she is totally disabled.[51] The results of plaintiff's March 1, 2000 evaluation were qualified, however, by the examiners' statements that plaintiff's decline in performance was inexplicable, and "[c]omplicating the evaluation results were [plaintiff's] marginal performance on cognitive and emotional validity measures, and her possible interest in seeking long-term disability."[52] The examiners concluded by opining that, "with successful treatment of her post-concussive syndrome, [plaintiff] should be able to return to work as a secretary."[53]

In summary, no authority other than the Social Security Administration is of the opinion that plaintiff is permanently unable to perform the material duties of an administrative assistant on either a full- or part-time basis. In fact, the consensus of medical opinions is that there is no reason plaintiff cannot return to work, so long as she receives appropriate psychiatric treatment, perhaps in conjunction with medication. Given the unanimity of the medical opinions regarding plaintiff's condition, the court cannot say that Provident was "wrong" in determining that plaintiff is not entitled to long-term disability-benefits under the DMR Plan.

### III. CONCLUSION

For the foregoing reasons, defendants' motions for summary judgment are due to be granted. Provident's motion for leave to file a reply brief will be denied as moot. An appropriate order consistent with this memorandum opinion will be entered contemporaneously herewith.

DONE this **21st** day of July, 2003.

United States District Judge

---

[51] Plaintiff's brief opposing summary judgment, at 3-4.
[52] PLACL00087.
[53] PLACL00086 (emphasis omitted).